Seth "Turtle" Johnson (WBA 7-5748)
Slow and Steady Law Office, PLLC
1116 W. Farm Ave.
P.O. Box 1309
Saratoga, WY 82331
(307) 399-6060
Turtle@SlowandSteadyLaw.com

*Counsel for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| WYOMING GUN OWNERS, a Wyoming nonprofit corporation,<br><br>  *Plaintiff,*<br><br>   *v.*<br><br>EDWARD BUCHANAN, in his official capacity as Wyoming's Secretary of State; KAREN WHEELER, in her individual and official capacities as Wyoming's Deputy Secretary of State; KAI SCHON, in his individual and official capacities as Election Division Director for the Wyoming Secretary of State; and BRIDGET HILL, in her official capacity as Wyoming Attorney General.<br><br>  *Defendants.* | Civil Action No. 0:21-cv-00108-SWS<br><br>**MEMORANDUM IN SUPPORT OF WYOMING GUN OWNER'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>*Oral Argument Requested* |

# Table of Contents

Introduction ............................................................................................... 1

Statement of Facts .................................................................................... 1

Summary of Argument .............................................................................. 6

Argument .................................................................................................... 7

I.   WyGO will succeed on the merits ..................................................... 7

A.   Wyoming's electioneering regime is hopelessly vague. .................. 7

*1.   The "commentary" exception swallows the rule.* .............................. 9

*2.   Wyoming's electioneering-communications regime is vague because it is unclear which people qualify as an organization's "members" for purposes of the newsletter and internal communications exception*......................................11

*3.   Wyoming's electioneering-communications regime is vague because it does not adequately define which contributions "relate to" an electioneering communication.* ....................................................................................... 12

*4.   As applied to WyGO, Wyoming's electioneering-communications regime is vague because it fails to clearly demarcate between issue advocacy and the functional equivalent of express advocacy relating to specific candidates.* ......... 15

B.   Wyoming's electioneering-communications regime fails exacting scrutiny because the state lacks a substantial reason for requiring the disclosure of non-earmarked small-dollar donations. ..................................................... 17

II.   The violation of WyGO's First Amendment rights inflicts irreparable harm. 21

III.   The equities balance in favor of WyGO............................................ 22

IV.   Enforcing the First Amendment is in the Public Interest. ............................. 22

V.   The Rule 65(C) bond requirement should be waived because WyGO seeks only pre-enforcement injunctive relief and nominal damages ................................ 22

Conclusion................................................................................................. 23

## Table of Authorities

**Cases**

*Awad v. Ziriax,* 670 F.3d 1111 (10th Cir. 2012) ........................................................ 22

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) ............................................................ 21

*Buckley v. Valeo,* 424 U.S. 1 (1976).................................................................. 12, 13, 17

*Citizens United v. FEC,* 558 U.S. 310 (2010)...................................................... 10, 15

*Citizens United v. Gessler,* 773 F.3d 200 (2014) ............................................ 10, 19, 22

*City of Chicago v. Morales*, 527 U.S. 41 (1999)............................................................ 9

*Coal. for Secular Gov't v. Williams*, 815 F.3d 1267 (10th Cir. 2016).................. 17, 18

*Community Organizations for Reform Now v. Golden*, 744 F.2d 739 (10th Cir. 1984 8

*Dias v. City & Cty. of Denver*, 567 F.3d 1169 (10th Cir. 2009) ................................... 8

*Doctor John's, Inc. v. City of Roy,* 465 F.3d 1150 (10th Cir. 2006) .......................... 8, 9

*Dodger's Bar & Grill, Inc. v. Johnson Cnty. Bd. Of Cnty. Comm'rs,* 32 F.3d 1436

 (10th Cir. 1994) ..................................................................................................... 21

*Elrod v. Burns,*

 427 U.S. 347 (1976) ............................................................................................... 21

*FEC v. Wisc. Right to Life,* 551 U.S. 449 (2007) .................................................. 15, 22

*First Nat'l Bank v. Bellotti,* 435 U.S. 765 (1978)...................................................... 10

*Free Speech v. FEC,* 720 F.3d 788 (10th Cir. 2013).................................................. 15

*Galbreath v. City of Oklahoma City*, 568 F. App'x 534 (10th Cir. 2014) ..................... 9

*Grayned v. City of Rockford*; 408 U.S. 104 (1972) ....................................................... 8

*Hill v. Colorado*, 530 U.S. 703 (2000) ......................................................................... 8

*Hynes v. Mayor and Council of Borough of Oradell*, 425 U.S. 610 (1976)................... 8

*Independence Institute v. Williams,* 812 F.3d 787 (10th Cir. 2016).................... 18, 19

*Jordan v. Pugh*, 425 F.3d 820 (10th Cir. 2005) ..................................................... 8, 20

*Klein v. City of San Clemente,*

    584 F.3d 1196 (9th Cir. 2009) ...................................................................... 22

*Long Beach Area Peace Network v. City of Long Beach,*

    522 F.3d 1010 (9th Cir. 2008) ...................................................................... 22

*Matal v. Tam,* 137 S. Ct. 1744 (2017) ............................................................... 15

*RoDa Drilling Co. v. Siegal,* 552 F.3d 1203 (10th Cir. 2009) ................................ 7, 22

*Roman Catholic Diocese v. Cuomo,*

    141 S. Ct. 63 (2020) ...................................................................................... 22

*Sampson v. Buescher,* 625 F.3d 1247 (10th Cir. 2010) ........................................ 17, 18

*Sindicato Puertorriqueño de Trabajadores v. Fortuno,*

    699 F.3d 1 (1st Cir. 2012) .............................................................................. 22

*Taylor v. Roswell Indep. Sch. Dist.,* 713 F.3d 25 (10th Cir. 2013) ........................... 20

*United States v. Franklin-El,* 554 F.3d 903, (10th Cir. 2009) .................................... 9

*United Utah Party v. Cox,* 268 F. Supp. 3d 1227 (D. Utah 2017) ............................ 23

*Verlo v. Martinez,* 820 F.3d 1113 (10th Cir. 2016) ................................................... 7

*Ward v. Utah,* 398 F.3d 1239 (10th Cir. 2005) ......................................................... 8

*Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7 (2008) ................. 7, 21

## Statutes

Wyo. Stat. § 22-25-101(c)(i)-(ii) ............................................................................. 11

Wyo. Stat. § 22-25-106(h) ..................................................................... 12, 13, 14, 19

## Other Authority

*"Commentary."* Merriam-Webster.com Dictionary, Merriam-Webster,

    https://www.merriam-webster.com/dictionary/commentary (last visited 17 May

    2021) .............................................................................................................. 9

**Treatises**

Eugene Volokh, *Freedom for the Press as an Industry, or for the Press as a Technology? From the Framing to Today,* 160 U. Pa. L. Rev. 459 (2012).............. 10

INTRODUCTION

Americans have the right to speak freely about candidates for elected office, including the right to publicly examine candidates' positions on salient policy issues. Americans also have a right to know what a law means, especially one that may sanction them for engaging in political speech. Vague campaign laws invite arbitrary enforcement and chill speech.

Wyoming's electioneering-communications regime is unduly vague in defining reportable speech, fails to clearly define what contributions must be reported, and violates people's interest in maintaining the privacy of their political associations and preferences. In addition, Wyoming's regulatory scheme invites third parties to complain to state authorities and shut down their political opponents' speech during campaign season, when it matters most. This Court should enjoin this ongoing violation of First Amendment rights.

STATEMENT OF FACTS

Plaintiff Wyoming Gun Owners ("WyGO") is a non-profit corporation whose mission is "defending and advancing the 2nd Amendment rights of all law-abiding citizens in the state of Wyoming — and exposing legislators who refuse to do the same thing." Declaration of Aaron Dorr, ¶ 4; www.wyominggunowners.org. WyGO uses a variety of media and formats to promote its message, including posting information on its website, disseminating and publishing candidate surveys, videos, emails to members and non-members, radio ads, digital ads, Facebook posts, and direct mail. *Id.,* ¶ 5.

WyGO targets its speech to reach voters, candidates, and elected officials in Wyoming and often promotes its messages during election season, when gun-policy issues are top of mind. *Id.,* ¶ 6. WyGO lacks dedicated in-house lawyers or campaign finance staff. *Id.*

1

WyGO considers anyone who donates to it to be a member. *Id.,* ¶ 7. In addition, anyone can sign up to receive emails from WyGO about gun policy and candidate positions. *Id*. WyGO funds its operations mostly through small-dollar donations. *Id.,* ¶¶ 7-8.  Approximately 90% of WyGO's donations are for amounts under $100, with approximately 8% being for amounts between $100-200. *Id.,* ¶ 8.  Only about 2% are for larger amounts and large donations typically comprise only a small part of WyGO's annual budget. *Id.,* ¶ 8.

WyGO does not provide donors a means to earmark contributions for specific purposes on their online donation platform or hard-copy donation form. *Id.,* ¶¶ 9-12. All WyGO donations go into one of two accounts—one for online donations, the other for mail-in donations. *Id.,* ¶ 10.

WyGO's never discloses its members, and numerous WyGO members have expressed concern to WyGOs principal, Aaron Dorr. about having their names disclosed. *Id.,* ¶ 13.

### *WyGO's 2020 Political Speech*

During the 2020 election season, WyGO exercised its First Amendment rights to speak to its members and other Wyoming voters about salient political issues, including where candidates for office stood on Second Amendment issues. *Id.,* ¶ 15. It did so by way of paid-for radio advertising, email blasts, direct mail, digital advertising and posting videos, surveys, and other commentary on its public website and social-media platforms. *Id*.

In August 2020, prior to the primary election, WyGO paid a commercial radio station about $1229 to run a 60-second issue ad in the Cheyenne radio market. *Id.,* ¶ 21.  The radio ad mentioned two opposing state senate candidates by name, extolling one candidate for supporting gun rights, and criticizing another for silence on the issue and potential hostility to gun rights. *Id*.

2

On July 15, 2020, WyGO sent an email blast to its members entitled "WYGO's Primary Action Plan!" *Id.,* ¶¶ 22-23, Ex. A.  The email solicited donations for funding the plan. It also criticized certain gun-related policy proposals and included a description of several candidates' positions on Second Amendment issues. *Id.* However, the email did not urge that readers vote for a specific candidate. *Id.*  The July 15 email was sent to both dues-paying WyGO members and non-members who had signed up to receive email communications from WyGO. *Id.,* ¶ 26.

On August 1, 2021, WyGO sent a direct mail piece to dues-paying WyGO members and people identified as likely pro-gun Wyoming voters, communicating that one candidate had supported "pro-gun legislation," while his opponent had refused to answer WyGO's candidate survey.  *Id.,* ¶¶ 27-28, Ex. B, The mailer exhorted readers to thank the first candidate for supporting gun rights, and to tell the second candidate that "trying to hide her views on an issue as important as our gun rights is flat-out unacceptable," but never urged readers vote for a specific candidate. *Id.* The mailer also criticized various policy proposals. *Id.*

On September 24, 2020, WyGO sent an email blast to dues-paying WyGO members and non-members who had signed up to receive WyGO's email communications, entitled "Big Tech is Trying to Censor Your Gun Rights!" *Id.,* ¶¶ 30-32, Ex. C. The email communicated concerns that social media platforms such as Facebook were censoring pro-gun speech, while favoring other political speech. *Id.* In this email, WyGO also described the gun-rights policy positions of several candidates for state senate and the state house, but did not urge that readers vote for a specific candidate in the general election. *Id.*

WyGO's postings at www.wyominggunowners.org and digital media ads on Facebook expressed similar messages. *Id.,* ¶¶ 33-37.  WyGO's website and Facebook content during the 2020 election cycle included political commentary on gun-rights

issues, candidates' answers to WyGO's questionnaire on gun-related policies, and
"white-board videos" in which Dorr discussed competing Wyoming candidates' gun-
related positions using a white dry-erase board. *Id*. The videos often included
requests to contact and thank pro-gun-rights candidates, and contact and criticize
candidates who supported gun-control or did not return WyGO's questionnaire. *Id*.
Such videos never included an explicit appeal to vote for or against a specific
candidate. *Id*.

*The Regulatory Regime's Enforcement Against WyGO*

The Greater Wyoming Chamber of Commerce typically supports candidates who
differ from WyGO on Second Amendment rights. *Id.*, ¶ 38.  In October 2020,
Chamber President and CEO Dale Steenbergen wrote Defendant Kai Schon, the
Elections Division Director of the Wyoming Secretary of State's Office, complaining
that WyGO had violated Wyoming campaign finance laws. *Id.*, ¶¶ 39-40, Ex. D.
Steenbergen claimed that the radio ad, the July 15 and September 24 emails, and
the August 1 mailer were "electioneering communications,", and asked that "actions
be taken immediately" to prevent what he called further illegal interference with
Wyoming elections. *Id*. Steenbergen also referenced WyGO's "digital ads" and
"Facebook posts," but did not describe such communications in detail or provide
specific examples. *Id*.  In response to Steenbergen's letter, Defendant Buchanan's
office initiated an investigation into WyGO's political speech. *Id.*, ¶¶ 41-42, Ex. E.

Defendant Kai Schon, on behalf of Defendant Buchanan, subsequently emailed
Dorr, declaring that unspecified "advertisements" paid for by WyGO were
reportable electioneering communications and threatened to fine WyGO for failing
to comply. *Id*. WyGO's counsel responded, noting that Schon had failed to provide
the revised complaint or exhibits of the alleged communications, and asserting that

WyGO's issue advocacy was not an "electioneering communication." *Id*., ¶¶ 43-44, Ex. F.

Then-Assistant Attorney General James LaRock responded to WyGO's counsel, purporting to explain why the Secretary of State's office deemed WyGO to have engaged in "electioneering communications." *Id.,* ¶¶ 45-46, Ex. G. LaRock focused on the statement "tell Johnson that Wyoming gun owners need fighters, not country club moderates who will stab us in the back." *Id.* He also asserted that the radio ad "instructs listeners which candidate to support and oppose," although words to that effect are never spoken in the ad. *Id.* LaRock further speculated that other WyGO communications - including possibly the July 15 email, August 1 mailer, and September 24 email - may have been electioneering communications, if they were sent to persons outside of WyGO's membership. *Id.* WyGO did not file any reports as a result of LaRock's explanations because it believed that none of the communications at issue were "electioneering communications." *Id.,* ¶ 49, Ex. F.

On December 2, 2020, Defendant Deputy Secretary of State Karen Wheeler signed a FINAL ORDER IMPOSING CIVIL PENALTY against WyGO. *Id.,* ¶¶ 47-48, Ex. H. The Final Order expressed Wheeler's opinion that the radio ad was an electioneering communication because "the ad can only be reasonably interpreted as an appeal to vote for Senator Bouchard and to vote against Johnson." *Id.* Defendant Wheeler found that WyGO had failed to file the required reports and fined the group $500. *Id.* Notwithstanding the Chamber's complaints about the other communications, the Final Order was silent as to the July 15 email, August 1 mailer, or September 24 email. *Id.* The Final Order was also silent about digital ads and Facebook posts. *Id.*

*The Regulatory Regime's Continuing Impact on WyGO's Speech*

WyGO intends to continue its issue advocacy, but will reduce its activity owing to the legal uncertainty surrounding this speech. *Id.,* ¶ 50.  During both non-election and election years, including within 30 days and 60 days of both primary and general elections, WyGO would normally plan to continue airing radio ads, posting website content, videos, digital ads, Facebook content and sending emails and direct mailers to Wyoming residents featuring materially and substantially similar content as it has in the past. *Id.,* ¶ 50. But WyGO cannot reasonably predict whether state officials—whether independently or at the prompting of WyGO's political opponents—will determine that one of its communications that merely criticizes a candidate or asks people to contact an elected official would subject it to Wyoming's electioneering communications regime, or whether any of the exceptions would apply. *Id.,* ¶ 51. Even if it determined that it made an electioneering communication, WyGO does not know which of its donors or contributions would "relate to" a particular electioneering communication and must therefore be disclosed. *Id.,* ¶ 52. Moreover, the uncertainty about these provisions' application makes WyGO a target for additional complaints by its political opponents, such that WyGO can reasonably expect to face further compliance costs for expressing itself even if it would ultimately prevail with respect to those complaints. *Id.,* ¶ 53.  In the absence of clarity about the contours of Wyoming's electioneering regime, WyGO intends to forego speaking during election season, a time when its speech tends to have the greatest impact for members, the electorate, and candidates. *Id.,* ¶ 54.

SUMMARY OF ARGUMENT

WyGO satisfies all four preliminary injunction elements. WyGO is likely to prevail on the merits because Wyoming's electioneering-communications regime is vague. It includes a broad exception for political commentary that might apply to

most of WyGO's speech, it fails to define the scope of an organization's membership for purposes of the newsletter exception, and it includes an incomprehensible requirement that speakers disclose contributions that "relate to" and electioneering communication. In addition to being too vague to give adequate notice, Wyoming's disclosure regime also fails exacting scrutiny because it (1) targets small-dollar donations; (2) lacks an earmarking component; and (3) fails to consider that WyGO's viewpoint is readily apparent most of the Wyoming electorate, therefore unduly burdening the rights of speakers and donors. Finally, Wyoming's regime is overbroad to the extent that it seeks to regulate the choices of individuals who voluntarily sign-up for WyGO's emails or visit WyGO's website to view content, without donating any money to it.

ARGUMENT

Preliminary injunction movants bear the burden of establishing four factors weigh in their favor: (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (citing *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20-21 (2008) *("NRDC")*. In the First Amendment context, "the likelihood of success on the merits will often be the determinative factor" because of the seminal importance of the interests at stake. *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016).

I. WYGO WILL SUCCEED ON THE MERITS.

   A. Wyoming's electioneering regime is hopelessly vague.

The axiom that laws must provide the governed with adequate notice rings particularly true when to the government regulates how Americans speak about it. The potential for chilling speech heightens vagueness concerns in the First

Amendment context. *Doctor John's, Inc. v. City of Roy*, 465 F.3d 1150, 1157 (10th Cir. 2006) (citing *Grayned v. City of Rockford*; 408 U.S. 104, 108 (1972); *Hynes v. Mayor and Council of Borough of Oradell*, 425 U.S. 610, 620 (1976)).

Wyoming's electioneering-communications regime is vague because it (1) contains a broad "commentary" exception that swallows the rule; (2) fails to define who are "members" for purposes of the newsletter exception; (3) fails to define what contributions are to be considered "related to" an electioneering communication; and (4) fails to clearly demarcate between unregulated issue advocacy and regulated electioneering communications.

As with all laws burdening First Amendment rights, the government bears the burden of proving the electioneering scheme's constitutionality. *Association of Community Organizations for Reform Now v. Golden*, 744 F.2d 739, 746 (10th Cir. 1984). "As a basic matter of due process, a law is 'void for vagueness' if it does not clearly define its prohibitions." *Doctor John's,* 465 F.3d at 1157 (citing *Grayned*, 408 U.S. at 108). The void-for-vagueness doctrine "put[s] the public on notice of what conduct is prohibited" and "guard[s] against arbitrary enforcement." *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1179 (10th Cir. 2009). A statute is therefore impermissibly vague and void if it (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," *or* (2) "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). These are two independent reasons for a court to invalidate a statute for vagueness. *Jordan v. Pugh*, 425 F.3d 820, 824-25 (10th Cir. 2005).

A plaintiff can challenge the validity of a statute by arguing that the statute is void for vagueness either facially or as applied. *Ward v. Utah*, 398 F.3d 1239, 1246-47 (10th Cir. 2005). To succeed on a facial challenge, a plaintiff "must show, at a

minimum, that the challenged law would be vague in the vast majority of its applications; that is, that 'vagueness *permeates* the text of [the] law.'" *Doctor John's*, 465 F.3d at 1157 (emphasis added) (quoting *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999)). In as-applied challenges, courts "must tether [their] analysis to the factual context in which the ordinance was applied." *Galbreath v. City of Oklahoma City*, 568 F. App'x 534, 539 (10th Cir. 2014); *see also United States v. Franklin-El*, 554 F.3d 903, 910 (10th Cir. 2009) (court must "consider th[e] statute in light of the charged conduct.") WyGO challenges the electioneering regulation scheme facially and as-applied to its speech.

> 1. *The "commentary" exception swallows the rule.*

Wyoming's regime defines what constitutes an "electioneering communication," but provides for several exceptions. Among these is an exception for news reports and "commentary" that otherwise meet the definition of electioneering communications. Because the "commentary" exception is so broad, it hollows out the definition of "electioneering communication," making it too vague to provide reasonable notice.

After all, the plain meaning of "commentary" includes "an expression of opinion," *"Commentary."* Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/commentary (last visited 17 May 2021)—and what more-obvious example of "an expression of opinion" could be offered than a political opinion about a candidate or policy?

Almost any of the communications pushed out by WyGO within 30 days of a primary, or 60 days of a general election, would qualify as "commentary," and that description also fits the specific communications Mr. Steenbergen mentioned in his complaint to Defendants. In WyGO's particular case, the commentary is almost exclusively focused on the topic of gun policy, including how state lawmakers voted,

and what candidates said in response to WyGO's policy surveys (or whether they responded to the surveys at all). Based on this information, WyGO often categories a candidate as "pro-gun" or "anti-gun," sometimes using more colorful language to maximize the impact of its speech.

Other speakers might focus on different policy issues or viewpoints altogether. But all speakers who wish to engage in political commentary should enjoy their right to do so without worrying about complaints from opponents or competitors.

Any American is free to post her opinions on social media, a bumper sticker on her car, or place a yard sign in front of her house, whether she works for a newspaper or not. And any "individual person's right to speak includes the right to speak *in association with other individual persons." Citizens United v. FEC,* 558 U.S. 310, 391 (2010) (Scalia, J., concurring); *see also First Nat'l Bank v. Bellotti,* 435 U.S. 765, 795-802 (1978) (freedom of the press is not limited to the institutional press and "does not 'belong" to any definable category of persons or entities: it belongs to all who exercise its freedoms.") (Burger, C.J., concurring); *Citizens United v. Gessler*, 773 F.3d 200, 212 (2014) ("we hold that the First Amendment requires the Secretary to treat Citizens United the same as the exempted media.").[1]  That is what WyGO is – a collection of Wyoming residents expressing political commentary on issues that they care deeply about.

The commentary exemption requires that the speech be "protected by the first amendment [sic]" or its state analogue, and WyGO's political speech indisputably

_____

[1] *See also,* Eugene Volokh, *Freedom for the Press as an Industry, or for the Press as a Technology? From the Framing to Today,* 160 U. Pa. L. Rev. 459, 463 (2012) ("[p]eople during the Framing era likely understood the text as fitting the press-as-technology model - as securing the right of every person to use communications technology, and not just securing a right belonging exclusively to members of the publishing industry."). As such, WyGO, and speakers like it, are no less entitled to the Press Clause's protection, than the Caspar Star-Tribune.

meets this minimal threshold.  Yet this did not prevent WyGO from running afoul of the Chamber of Commerce or the Secretary of State.

This puts WyGO in a difficult position in advance of the 2022 election season, because it does not know which of its political messages will invite third-party complaints or enforcement by the Secretary of State. As a result, WyGO will reduce its speech and may well avoid speaking 30 days before a primary election or 60 days before a general election, altogether, thereby chilling core political speech and watering down the impact of its messages. Dorr. Dec., ¶¶ 50-54. In addition to depriving WyGO of its right to speak when its messages matter the most, the regulatory regime deprives Wyoming gun owners, and the wider electorate, of the opportunity to learn WyGO's viewpoints on issues that they care about. While Wyoming's electioneering-communications regime is indeed vague enough to deserve facial invalidation, at a minimum, it should be struck down as applied to WyGO.

2.    *Wyoming's electioneering-communications regime is vague because it is unclear which people qualify as an organization's "members" for purposes of the newsletter and internal communications exception.*

Wyoming's electioneering regime provides an exception for internal communications and newsletters sent to members and employees. Wyo. Stat. § 22-25-101(c)(ii)(A). It does not, however, offer the state's understanding of how membership is determined, rendering the scheme too vague to give reasonable people adequate notice.

WyGO considers anyone who has contributed to it, in any amount, to be a member, but also allows people to sign up to receive informational emails about gun policy, even if they are not dues-paying members. But it is unclear how the Secretary of State defines membership. A reasonable person is left to speculate whether membership is defined by the organization itself or some other criteria.

Does membership require paying dues? What if the organization has a practice of not charging dues? What about professing a certain set of beliefs? Tithing or other financial support? Living in a certain geographic area or jurisdiction? In WyGO's case, would it be sufficient to profess that one is interested in gun policy? What if someone paid dues, forgot to renew, but did not formally withdraw her membership? What if the organization changes the criteria for membership? Can an organization determine that all Wyomingites of voting age are considered members?

Because Wyoming's statute fails to adequately define membership criteria, and Defendants have otherwise failed to provide guidance on the criteria, a reasonable speaker is left to speculate as to how this exception should be applied, making the statutory regime too vague to give adequate notice.

> 3.   *Wyoming's electioneering-communications regime is vague because it does not adequately define which contributions "relate to" an electioneering communication.*

Any person or entity spending over $500 on an "electioneering communication" in any primary or general election must report the entity's contributions. Wyo. Stat. § 22-25-106(h). The problem with Wyoming's law is that it does not tell reporting entities *which* contributions must be reported. In addition, Wyoming's regime does not acknowledge the possibility that donors might not earmark their contributions for specific communications, let alone require that they do so.

What the statute does provide is that reporting entities must disclose only "those . . . contributions which *relate to* an…electioneering communication." *Id.* (emphasis added). Such vague wording has been subject to judicial approbation going back to the days of *Buckley v. Valeo,* where the Supreme Court expressed exasperation with the Federal Election Campaign Act's vague relative-to-a-clearly-defined-candidate standard. 424 U.S. 1, 41-43 (1976). The "use of so indefinite a phrase as 'relative to' a candidate fails to clearly mark the boundary between permissible and

impermissible speech," unless clarified elsewhere in the statute. *Id.* at 41-42. Such vagueness "offers no security for free discussion" and "compels the speaker to hedge and trim." *Id.* at 43. Wyoming's use of "related to" is no less vague than Congress's, and equally unconstitutional.

While one might relate a specific contribution to a specific communication via an express earmark by the donor, such linkage is often impossible. Many, perhaps most, donors to small-scale organizations such as WyGO simply donate to support the organization's overall message, without a single specific communication in mind. One is left to speculate about how to assign how contributions "relate to" email blasts—which involve use of staff time, electricity, computers, internet connectivity, and other overhead, but do not require the purchase of time from a radio station or similar vendor. Defendants provide no guidance on how to determine whether a contribution relates to an electioneering communication.

Nevertheless, the list demanded for the Secretary of State specifies detailed and confusing requirements:

> Set forth the *full and complete record of contributions which relate to an* independent expenditure or *electioneering communication,* including cash, goods or services and actual and promised expenditures. *The date of each contribution of one hundred dollars ($100.00) or more,* any expenditure or obligation, *the name of the person from whom received or to whom paid and the purpose of each expenditure or obligation shall be listed. All contributions under one hundred dollars ($100.00) shall be reported but need not be itemized.* Should the accumulation of contributions from a person exceed the one hundred dollar ($100.00) threshold, all contributions from that person shall be itemized;

Wyo. Stat. § 22-25-106(h)(v) (emphasis added).

The contribution disclosure requirement is nearly incomprehensible. What does it mean for a contribution to "relate to" an electioneering communication, especially where neither the entity nor its contributors have a practice of earmarking or

otherwise specifying how donations will be utilized? Is the entity required to report no contributions because they do not sufficiently "relate to" the electioneering communication? Or must it report all contributions, because they all might in some small way fractionally relate to an electioneering communication or displace other expenditures that are used for such communications? Reporting parties are left to speculate—and donors too.

Moreover, the contribution disclosure requirement exacerbates its incomprehensibility by first appearing to create a carve-out for contributions of $100 or more, but then decreeing that contributions of less than $100 will be "reported but need not be itemized," and also requiring the aggregation of smaller contributions, which then triggers retroactive itemization. What this all means is anyone's guess, but they might be fined $500, anyway.

What does it mean to report, but not itemize a contribution? What is WyGO to do if a small-dollar donor does not earmark her contributions? Must WyGO infer a specific purpose that may not have been intended and itemize that purpose after the fact? How must all of the small dollar contributions relate to an electioneering communication, especially where they have not been earmarked? Do all small-dollar donations from one contributor that were used for other purposes also need to be itemized if some were used for electioneering communications and the total of all exceeds $100?

These requirements are particularly confusing for WyGO, or any entity, that does not provide for the earmarking of contributions and relies heavily on small-dollar contributions. Dorr Dec., ¶¶ 10. As a result, WyGO is in a particularly poor position to provide the information demanded by the Secretary of State, even if it could discern the meaning of "related to" as used in Wyo. Stat. § 22-25-106(h)(v).

In addition, WyGO's members tend to highly value their privacy, and are particularly averse to having their names disclosed. *Id.,* ¶ 13. Consequently, should WyGO be required to disclose its donors, likely fewer will donate to WyGO. That may be fine with the Greater Cheyenne Chamber of Commerce, but it would result in less speech, not more, and would undermine First Amendment values.

4.      *As applied to WyGO, Wyoming's electioneering-communications regime is vague because it fails to clearly demarcate between issue advocacy and the functional equivalent of express advocacy relating to specific candidates.*

Wyoming's definition of "electioneering communication" is vague as applied[2] to WyGO, because WyGO's radio ad and the email blasts all contained significant issue advocacy and could therefore not "only be reasonably interested as an appeal to vote for or against the candidate[s]" mentioned in these communications. Moreover, the fact that WyGO uses hard-hitting language which may have irritated the Secretary of State's Office, or the candidates in question, does not objectively make the radio ad or any other of WyGO's communications an "electioneering communication." The First Amendment does not mandate "happy talk," and speakers are free to craft their messages in ways that they believe will maximize their impact. *See Matal v. Tam,* 137 S. Ct. 1744, 1764-65 (2017).

WyGO's radio ad follows a pattern commonly found in WyGO's commentary. Dorr Dec., ¶¶ 16-21, 35, Ex. A.  The ad mentions two candidates for state office and discusses their records on gun-rights policy, or failure to discuss their views on gun-

---

[2] WyGO's complaint preserves the argument that the can-only-be-reasonably-interpreted-as-an-appeal-to-vote-for-or-against test is inherently subjective and thus facially vague. *See FEC v. Wisc. Right to Life ("WRTL"),* 551 U.S. 449, 493 (2007) (Scalia, J., concurring). But WyGO does not raise that argument in this motion, as current binding authority precludes it in the preliminary injunction context. *Citizens United*, 558 U.S. at 324-25 (2010) (describing the Chief's non-majority opinion in *WRTL* as "controlling"); *see also Free Speech v. FEC,* 720 F.3d 788, 794-95 (10th Cir. 2013).

rights policy. *Id.,* ¶ 21. It utilizes colorful, attention-getting (and effective) language that fits with WyGO's core mission and speaks to its membership in terms that resonate with them. *Id.,* ¶¶ 21, 37.

At no point does the ad expressly advocate a vote for or against either candidate. Although the radio ad is more positive in tone toward the perceived pro-gun candidate, the Secretary of State errs in characterizing the ad as one that "can only be reasonably interpreted as an appeal to vote for or against" each candidate. In fact, the ad can also plausibly be interpreted as an attempt to influence the other candidate to take more pro-gun positions, or at least make her positions on gun-policy known by posting her positions on her website. Finally, the ad can be interpreted as a request to either candidate to support gun rights, and not to waiver in that support after the election. Many communications may well seek to influence multiple actors, including both voters and candidates, and even candidates in other races, who may be observing. Dorr Dec., ¶¶ 18-20. Those multiple plausible interpretations and purposes illustrate that there is not *only* one interpretation of the radio ad, or WyGO's email blasts.

Accordingly, WyGO is left to guess where the line is. The Secretary of State has offered no guidance on this issue. Is it the use of provocative language that makes it qualify as *only* the functional equivalent of express advocacy? Is it the discussion of the candidate's records or failure to take a position? What combination of factors will cause WyGO's future communications to avoid being characterized as only the functional equivalent of express advocacy?

In the absence of guidelines, the safest route for WyGO is to avoid speaking about candidates during election season altogether. Dorr Dec., ¶ 54. If this provision can survive a facial challenge—and it should not—its application against WyGO has proven arbitrary.

B. Wyoming's electioneering-communications regime fails exacting scrutiny because the state lacks a substantial reason for requiring the disclosure of non-earmarked small-dollar donations.

Apart from its vagueness, Wyoming's electioneering-communications regime also fails exacting First Amendment scrutiny. Disclosure provisions must meet exacting scrutiny, which requires that the government show a substantial relation between the disclosure requirement and a sufficiently important government interest. *Free Speech,* 720 F.3d at 790 (citing *Citizens United,* 588 U.S. at 366-67). To withstand this scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights. *Coal. for Secular Gov't v. Williams*, 815 F.3d 1267, 1276 (10th Cir. 2016).

It is well-established that disclosure of contributions burdens First Amendment rights.

> It is undoubtedly true that public disclosure of contributions to candidates and political parties will deter some individuals who otherwise might contribute. In some instances, disclosure may even expose contributors to harassment or retaliation. These are not insignificant burdens on individual rights, and they must be weighed carefully against the interests which Congress has sought to promote by this legislation.

*Buckley,* 424 U.S. at 658. The administrative burdens associated with reporting and itemization also burden speech rights, especially for smaller organization that lack large staffs or in-house lawyers. *Sampson v. Buescher*, 625 F.3d 1247, 1255 (10th Cir. 2010); *see* Dorr Dec., ¶¶ 3, 6.

Governments typically seek to justify disclosure on the grounds of the electorate's informational interest, as well as the prevention of quid-pro-quo corruption. Since WyGO's donations do not involve direct contributions to candidates, or coordinated expenditures, the Court's focus here should be on the degree of the informational interest in disclosure. In weighing the government's informational interest in disclosure, the Tenth Circuit considers several factors including: (1) the dollar value of the donations to be disclosed; (2) whether the donations are earmarked for a

specific purpose; and (3) whether the speaking entity has a viewpoint or "brand" that is known to the audience, so that revealing the identity of donors does or does not significantly benefit the audience in assessing who is speaking.

The Tenth Circuit employs a sliding scale with respect to the informational interest in disclosure, based on the size of the donation, given the context of the race or ballot proposition. *Sampson,* 625 F.3d at 1260 ("We agree with the Ninth Circuit that '[a]s a matter of common sense, the value of this *financial* information to the voters declines drastically as the value of the expenditure or contribution sinks to a negligible level.'"). In *Sampson,* the thresholds at issue included registration of issue committees upon gathering over $200 in contributions or expenditures, as well as different disclosure requirements for contributions of $20 and over and $100 and over. *Id.* at 1249-50. The Tenth Circuit concluded that there was "virtually no proper governmental interest in imposing disclosure requirements on ballot-initiative committees that raise and expend so little money," and that the burdens outweighed the informational interest. *Id.* at 1249.

Similarly, in *Coal. for Secular Gov't v. Williams,* the Tenth Circuit held that Colorado's onerous reporting requirements for a small-scale issue committees were not justified by the modest informational value to voters. 815 F.3d at 1280. Even after the Secretary of State provided more guidance, the court still found its regime too cumbersome to justify the minimal information interest.

On the other end of the spectrum, the Tenth Circuit upheld Colorado's disclosure requirements for groups who annually spend $1000 or more to disclose donors of $250 or more and noted that the size of the election matters, relative to the disclosure thresholds. *Independence Institute v. Williams,* 812 F.3d 787, 797-98 (10th Cir. 2016).

In the case at bar, the entity threshold is set at $500 spent on electioneering communications in any primary or general election, including state-wide races. Wyo. Stat. § 22-25-106(h). The disclosure threshold is initially set at $100 per donor, but can be retroactively applied to smaller amounts. Wyo. Stat. § 22-25-106(h)(v). Thus, the dollar amounts at issue here are on the lower end of the informational spectrum.

Moreover, the disclosure regime upheld in *Independence Institute v. Williams* applied only to donations that had been earmarked for electioneering communications. 812 F.3d at 797 ("And it is important to remember that the Institute need only disclose those donors who have specifically earmarked their contributions for electioneering purposes."). The presence of earmarking was also significant in *Citizens United v. Gessler*, 773 F.3d 200, 211-12 (10th Cir. 2014) ("The only donors who must be disclosed (by name and occupation) are those who earmark contributions for the specific, *exclusive* purpose of electioneering communications or expenditures regarding Colorado candidates.").

Here, this important tailoring factor is absent, or at least in-so-far-as one can tell from the vague text of the statutes; and WyGO does not provide for earmarking of donations, so that factor is functionally absent from this case altogether.

The value of the information interest should also be evaluated in light of whether the disclosures tell voters anything meaningful about the speaker's nature. *Gessler*, 773 F.3d at 215-216 (refuting contention that Citizens United was a "drop-in" speaker and unknown quantity). It may be that in some situations learning who donates can tell the electorate where an organization is on the political spectrum or what viewpoint is being promoted, but such interests are absent here.

As the name implies—Wyoming Gun Owners—is an organization that takes unflinchingly pro-Second Amendment positions, and its donors (members) are in

fact people in Wyoming who own guns, care deeply about gun rights, and oppose gun control. This will not be news to the Wyoming electorate.

Taken all of these factors together, Wyoming's electioneering-communications regime fails exacting scrutiny, both facially and as-applied to WyGO. First, it has a relatively low threshold for reporting, both as an entity and for individual donations, potentially requiring the itemization of donations under $100 and the un-itemized reporting of sub-$100 donations (the exact requirements remain unclear). Second, Wyoming's regime lacks an earmarking requirement. Third, the informational value of disclosing WyGO's donors is low, because the position and viewpoints of WyGO and its members are well known.

This low informational value and lack of tailoring must be balanced against the administrative burden of reporting for a small organization such as WyGO and the privacy interest of its members. The concern about disclosure is particularly heightened for WyGO, and requiring disclosure of small donations may prevent WyGO from speaking altogether, or at least significantly limit donations. Wyoming's regime fails exacting scrutiny.

C. Wyoming's electioneering-communications regime is also overbroad to the extent it fails to allow non-donors to voluntarily associate themselves with WyGO's messages by signing up for its email communications or visiting its website.

WyGO is also likely to succeed on its overbreadth claim, because Wyoming residents should be free to voluntarily sign-up to receive WyGO's emails or visit its website to view "white board" videos or other commentary. Overbreadth is a doctrine closely related to vagueness, but with some subtle differences. *Jordan*, 425 F.3d at 827; *Taylor v. Roswell Indep. Sch. Dist.,* 713 F.3d 25, 41 (10th Cir. 2013).

Overbreadth attacks have been successful where a court thought rights of association were ensnared in statutes which, by their broad sweep, might result in

burdening innocent associations. *Broadrick v. Oklahoma*, 413 U.S. 601, 615-16 (1973). The "overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Dodger's Bar & Grill, Inc. v. Johnson Cnty. Bd. Of Cnty. Comm'rs,* 32 F.3d 1436, 1442 (10th Cir. 1994).

Here, in-so-far-as Defendants seek to regulate communications with non-members who have voluntarily signed up to receive WyGO's emails, but not donated to WyGO, the state's electioneering-communications regime is overbroad because it reaches constitutionally protected conduct that is beyond the statutes' plainly legitimate sweep; that is, it improperly burdens the right of Wyoming residents to associate with WyGO and sign-up for a voluntary email list, whether they pay for membership or not. The same is true of anyone voluntarily visiting WyGO's website to review commentary there.

Defendants and the State of Wyoming simply have no legitimate interest in regulating whether state residents take voluntary action to opt-in to receive information about state policies that affect fundamental constitutional rights. If the converse were true, then state officials would also be free to regulate the electorate's internet-browsing, book-purchasing, or library-lending habits. As a result, Wyoming's election-communications regime should be found facially unconstitutional, or at least as applied to WyGO.

II.  THE VIOLATION OF WYGO'S FIRST AMENDMENT RIGHTS INFLICTS IRREPARABLE HARM.

The second requirement for injunctive relief, that WyGO suffer irreparable harm, *NRDC*, 555 U.S. at 20, is also met. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *accord Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63, 67 (2020). Indeed, "irreparable injury is presumed upon a determination that the movants are likely to prevail on their First Amendment claim." *Sindicato*

*Puertorriqueño de Trabajadores v. Fortuno*, 699 F.3d 1, 10-11 (1st Cir. 2012). "The harm is particularly irreparable where, as here, a plaintiff seeks to engage in political speech, as 'timing is of the essence in politics' and '[a] delay of even a day or two may be intolerable.'" *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (quoting *Long Beach Area Peace Network v. City of Long Beach*, 522 F.3d 1010, 1020 (9th Cir. 2008)).

III.   THE EQUITIES BALANCE IN FAVOR OF WYGO.

In balancing the equities, courts "must give the benefit of any doubt to protecting rather than stifling speech . . . [w]here the First Amendment is implicated, the tie goes to the speaker, not the censor." *WRTL*, 551 U.S. at 469, 474; *see also Awad v. Ziriax,* 670 F.3d 1111, 1131-32 (10th Cir. 2012) ("But when the law that voters wish to enact is likely unconstitutional, their interests do not outweigh Mr. Awad's in having his constitutional rights protected."). The State of Wyoming's interest in disclosures about electioneering communications does not outweigh the burden on WyGO's right to speak about political issues during campaign season, and the electorate's right to hear their speech.

IV.   ENFORCING THE FIRST AMENDMENT IS IN THE PUBLIC INTEREST.

The public's interest favors the enforcement of constitutional rights, especially when it comes to political speech. *Gessler*, 773 F.3d at 218-19. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad,* 670 F.3d at 1132 (internal quotation marks omitted).

V.   THE RULE 65(C) BOND REQUIREMENT SHOULD BE WAIVED BECAUSE WYGO SEEKS ONLY PRE-ENFORCEMENT INJUNCTIVE RELIEF AND NOMINAL DAMAGES

"Trial courts have wide discretion under Rule 65(c) in determining whether to require security." *RoDa Drilling,* 552 F.3d at 1215; *see also United Utah Party v. Cox,* 268 F. Supp. 3d 1227, 1260 (D. Utah 2017) (waiving the bond requirement when a preliminary injunction "enforces fundamental constitutional rights against

the government.") As an injunction securing WyGO's First Amendment rights could not financially injure the state, a bond should not be required.

CONCLUSION

WyGO's motion for a preliminary injunction should be granted because is likely to succeed in showing that Wyoming's electioneering-communications regime is unduly vague, overbroad, and fails exacting scrutiny. In addition, the other preliminary injunction factors favor WyGO.

DATED: June 4, 2021

Respectfully submitted,


_s/Seth Johnson_
Seth "Turtle" Johnson (WBA 7-5748)
Slow and Steady Law Office, PLLC
1116 W. Farm Ave.
P.O. Box 1309
Saratoga, WY 82331
(307) 399 – 6060
Turtle@SlowandSteadyLaw.com


_s/Stephen Klein_
Stephen Klein
Barr & Klein PLLC
1629 K St NW Ste. 300 Washington,
DC 20006
(202) 804-6676
steve@barrklein.com


_Counsel for Plaintiff_

_s/Endel Kolde_
Endel Kolde (pro hac vice pending)[3]
Institute for Free Speech
1150 Connecticut Avenue, NW, Suite 801
Washington, DC 20036
(202) 301-1664
Facsimile: (202) 301-3399
dkolde@ifs.org

---

[3] Admitted in Washington State. Not admitted to practice in the District of Columbia. Currently supervised by D.C.-licensed attorneys.