

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

---

WYOMING GUN OWNERS, *a Wyoming nonprofit corporation, also known as WyGO*,

        Plaintiff,

    vs.

WYOMING SECRETARY OF STATE, *et al*,

        Defendants.

Case No. 21-CV-108-SWS

---

## ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

---

This matter comes before the Court on Plaintiff Wyoming Gun Owners' *Motion for Preliminary Injunction*. (ECF No. 29.) Defendants Wyoming Secretary of State Edward Buchanan, Wyoming Deputy Secretary of State Karen Wheeler, Election Division Director for the Wyoming Secretary of State Kai Schon, and Wyoming Attorney General Bridgett Hill, in their official capacities[1], oppose the motion. (ECF No. 33.) Having reviewed the parties' briefing and otherwise being fully advised, the Court finds the motion should be denied.

### BACKGROUND

---

[1] This Court previously issued an *Order Granting in Part, Denying Part Defendants' Motion to Dismiss* (ECF No. 38), which identified the proper parties to this suit and dismissed claims against defendants in their individual capacities.

Plaintiff Wyoming Gun Owners ("WyGO") is a non-profit corporation whose mission is "defending and advancing the 2nd Amendment rights of all law-abiding citizens in the state of Wyoming – and exposing legislators who refuse to do the same thing." (ECF No. 30 at 6.) WyGO is comprised of many members who subscribe to receive communications from WyGO about pertinent issues relevant especially to state and local Second Amendment legislation. According to WyGO, anyone who donates to the organization is designated as a member. (*Id*. at 7.) Anyone can sign up to receive emails from WyGO about gun policy and candidate positions. (*Id*.) WyGO uses a variety of media and methods to promote its messaging, including posts to its own website, dissemination of candidate surveys, videos, emails to members and non-members, radio ads, digital ads, Facebook and other social media posts, and direct mailings. (*Id*. at 6.) WyGO oftentimes ramps up its messaging during election season when gun-policy issues come to the forefront.

In August of 2020, just before Wyoming's primary election, WyGO paid a commercial radio station roughly $1,229 to run a minute-long "issue ad" in the Cheyenne radio market. (*Id*. at 7.) The radio advertisement mentioned two opposing state senate candidates by name, commending one candidate for supporting gun rights and criticizing the other for silence on the issue and potential hostility to gun rights. (*Id*.) Around the same time, WyGO sent emails and direct mailings to its members soliciting donations for funding its "Primary Action Plan", communicating about "likely pro-gun Wyoming voters," and expressing concerns it had that social media platforms were censoring "pro-

gun speech." (*Id*. at 7–8.) It posted similar messages, digital media ads, and videos on its website and social media pages. (*Id*. at 8–9.)

On October 14, 2020, WyGO received a notice from Kai Shon, the Election Division Director of the Wyoming Secretary of State's Office, indicating they had received a complaint alleging WyGO had engaged in political activity requiring campaign finance reports, which WyGO had not filed. (*Id*. at 9, *see also* ECF No. 30-6.) Mr. Schon indicated in the letter that the Secretary of State's Office was aware WyGO had paid for unspecified advertisements and failed to comply with the requirements set forth in Wyo. Stat. § 22-25-106(h). (*Id*.) Because of its failure to comply, Mr. Schon explained WyGO had twenty-one days to comply with the reporting requirements in the statute, or be subject to a civil penalty of $500. (*Id*.) The Wyoming Secretary of State received the original complaint about WyGO's purported electioneering communications from the Greater Wyoming Chamber of Commerce, which WyGO alleges "typically supports candidates who differ from WyGO on Second Amendment rights." (*Id*.; *see also see* ECF No. 30-5.)

On October 21, 2020, counsel for WyGO responded to Mr. Schon, indicating that Mr. Schon failed to provide the actual complaint the Wyoming Secretary of State's Office had received or exhibits of the alleged electioneering communications. (ECF No. 30-7.) WyGO's counsel also stated his position that WyGO's issue advocacy was not an electioneering communication. (ECF No. 30-7.) The letter also asked the Wyoming Secretary of State's Office to "retract [its] threat against WyGO and dismiss the complaint of [the Greater Wyoming Chamber of Commerce] as baseless political bushwacking." (*Id*. at 2.)

On November 2, 2020, WyGO received a letter from James LaRock, Assistant Attorney General for Wyoming explaining why the advertisements WyGO paid for were considered electioneering communications under Wyoming law. (ECF No. 30-8.) Mr. LaRock set forth the statutory definition of electioneering communications and specifically explained how WyGO's radio advertisement was covered by that definition. (*Id*. at 2–3.) Mr. LaRock also indicated other exhibits attached to the complaint by the Greater Wyoming Chamber of Commerce "may be electioneering communications if they were sent to individuals outside of WyGO's membership." (*Id*. at 3.) Finally, Mr. LaRock directed WyGO to file a campaign finance report listing contributions and expenditures related to the radio advertisement "as well as any other electioneering communications WyGO caused to be made during the primary election." (*Id*. at 4.) WyGO declined to file a campaign finance report listing its contributions and expenditures related to the radio advertisement or any other communication or media it disseminated prior to the primary election.

Having received no campaign finance report from WyGO within the allotted time period, on December 2, 2020, Deputy Secretary of State Karen Wheeler signed a *Final Order Imposing Civil Penalty* against WyGO for only the radio advertisement. (ECF No. 30-9.) In imposing the penalty, the order explained, in part,

> 8. Before the 2020 primary election, Wyoming Gun Owners communicated with its members to express its intent to spend over $50,000 on digital ads, direct mail, email, and literature to support or oppose specific candidates in three state legislative races, including the race for the Republican nomination to represent State Senate District 6.

9. On August 7, 2020, Wyoming Gun Owners, through a third party, spent $1,229.10 for advertisement time on KGAB, a radio station that serves Cheyenne and southeast Wyoming.

10. Wyoming Gun Owners, through a third party, submitted an ad to run on KGAB. The ad expressly identified Senator Anthony Bouchard and Erin Johnson, candidates for the Republican nomination to represent State Senate District 6, a senate district that encompasses part of Cheyenne, eastern Laramie County, and part of Goshen County.

11. The ad described Senator Bouchard as a "brave champion" who will "fight for your gun rights" and "stand against" the "violent thugs [who] are rioting, looting, and vandalizing." The ad referred to Johnson as "pathetic" and warned that candidates like Johnson would "stab us in the back the first chance they get."

(*Id*. at 3) (internal references omitted). Finding the radio ad to be an electioneering communication under the meaning of the statute, and finding WyGO failed to file a report with the Secretary of State's Office listing itemized contributions and expenditures related to the radio ad, the Secretary of State determined a $500 civil penalty was required under Wyo. Stat. § 22-25-108(f). (*Id*. at 3–4.) The order was silent as to any other emails, mailers, or other communications by WyGO, penalizing WyGO only for the radio advertisement.

On June 1, 2021, WyGO filed a Complaint against Defendants Wyoming Secretary of State Edward Buchanan, Wyoming Deputy Secretary of State Karen Wheeler, Election Division Director for the Wyoming Secretary of State Kai Schon, and Wyoming Attorney General Bridgett Hill ("Defendants"). (ECF No. 1.) The Complaint alleges Wyoming's Electioneering Communications Statute is unconstitutional for several reasons. First, WyGO alleges the statutory scheme infringes on WyGO's First Amendment right of free speech both facially and as applied. (*Id*. at 12–15, Counts One and Two.) WyGO next alleges the statutory scheme violates WyGO's First Amendment right of free press. (*Id*. at

15–17, Count Three.) Finally, WyGO alleges the statute is unconstitutionally vague and overbroad. (*Id*. at 17–18, Count Four.) The Defendants moved to dismiss WyGO's complaint. (ECF No. 23.) The Court ruled on that motion, granting the motion in part and denying it in part. (ECF No. 38) The issues remaining after the Court's holding on the *Defendants' Motion to Dismiss* will be the only issues discussed in this order.

On July 12, 2021, WyGO filed the current *Motion for Preliminary Injunction*, arguing WyGO is entitled to a preliminary injunction because it is likely to succeed on the merits of the underlying case, arguing that Wyoming's electioneering communications regime is unconstitutionally vague. (ECF No. 30.[2]) The vagueness of the statutory scheme, WyGO argues, has caused WyGO to reduce issue advocacy activity in a time where it would be inclined to speak vocally about Second Amendment issues. WyGO asserts it satisfies all four requirements of a preliminary injunction, arguing it is likely to succeed on the merits of its constitutional claims, it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that the injunction is in the public interest. (*Id*. at 12.)

For their part, the Defendants argue the preliminary injunction sought by WyGO fits two disfavored categories. First, a preliminary injunction would change how the state regulates campaign finance laws, altering the status quo. Second, it would allow WyGO to forego campaign finance disclosure requirements, thereby granting WyGO the relief it ultimately seeks to recover after a disposition on the merits. (ECF No. 33 at 3.) Because

---

[2] WyGO filed its original *Motion for Preliminary Injunction* on June 4, 2021, but failed to attach a necessary affidavit. After consulting with one another and Magistrate Rankin, the parties agreed that WyGO's motion would be withdrawn and re-filed with supporting documents by July 12, 2021. (*See* ECF Nos. 8, 29.)

the request WyGO seeks is disfavored, the Defendants argue, WyGO is requirement to make a "strong showing" with respect to likelihood of success on the merits and with regard to the balance of harms. The Defendants assert WyGO will be unable to make such a showing, asking the Court to deny the motion. (*Id.*)

## LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy that is granted only when the movant's right to relief [is] clear and unequivocal." *First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1145 (10th Cir. 2017) (internal citation and quotation marks omitted). A party seeking a preliminary injunction bears the burden of establishing four elements: (1) a substantial likelihood of success on the merits, (2) irreparable injury unless the injunction issues, (3) the injunction, if issued, would not be adverse to the public interest, and (4) the threatened injury outweighs the injury the opposing party would suffer under the injunction. *See Schrier v. University of Co.*, 427 F.3d 1253, 12585 (10th Cir. 2005) (citing *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir.2003)). In the First Amendment context, "the likelihood of success on the merits will often be the determinative factor" because of the seminal importance of the interests at stake. *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016). The Court will address each factor in turn.

Courts in the Tenth Circuit disfavor certain types of preliminary injunctions, including preliminary injunctions that alter the status quo. *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004). "Because a historically disfavored preliminary injunction operates outside of the normal parameters for interim

relief," movants for this type of preliminary injunction must satisfy a heightened burden. *Id.* at 975–76. In this circumstance, Plaintiffs "may not rely on [the Tenth Circuit's] modified likelihood-of-success-on-the-merits standard" and instead "must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Id.* Because Plaintiff requests a preliminary injunction that mandates action, the Court finds that the heightened standard applies here.

DISCUSSION

**1. Likelihood of Success on the Merits**

Beginning with the first requirement, WyGO must establish it is likely to succeed on the merits of the underlying claim against Defendants. When a party seeks a preliminary injunction on the basis of a constitutional violation, the merits factor is often determinative. *See City of Pontiac Retired Employees Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014). As the claims in this case implicate the First Amendment, WyGO must first establish their activities are protected by the First Amendment. *Verlo*, 820 F.3d at 1128 (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985)). WyGO argues it exercises its First Amendment rights to "speak to its members and other Wyoming voters about salient political issues, including where candidates for office [stand] on Second Amendment issues." (ECF No. 30 at 7.) The Defendants do not appear to contest that WyGO's political speech is protected by the First Amendment. (*See* ECF No. 33 at 12.)

The First Amendment provides: "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble . . ."

Page **8** of 25

U.S. Const. amend. I. "The First Amendment, applied to states through the Fourteenth Amendment, prohibits laws abridging the freedom of speech." *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1193 (9th Cir. 2018) (internal quotation omitted). In effect, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United States v. Stevens*, 559 U.S. 460, 468 (2010) (quoting *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002)).

Discussion of public topics especially as they relate to a candidate's qualifications for office is "integral to the operation of the system of government established by our Constitution." *Bass v. Richards*, 308 F.3d 1081, 1089 (10th Cir. 2002) (citing *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (per curiam)). The Supreme Court has also made clear that "campaign finance laws regulate a form of political expression that implicate the broadest protection under the First Amendment" because they involve discussion of public issues and debate. *Petrella v. Brownback*, 787 F.3d 1242, 1258 (10th Cir. 2015). Furthermore, "implicit in the right to engage in activities protected by the First Amendment" is "a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Boy Scouts of America v. Dale*, 530 U.S. 640, 647 (2000). The First Amendment also provides fundamental protections against contributions and expenditure limitations for political campaigns, but disclosure requirements "impose no ceiling on campaign-related activities and do not prevent anyone from speaking." *Rio Grande Foundation v. City of Santa Fe*, 437 F.Supp.3d 1051, 1062 (D.N.M. 2020) (citing *Citizens United v. Federal Election Comm'n,* 558 U.S. 310, 366

(2010)). Unquestionably, WyGO's communications which support and defend the Second Amendment, are protected by the First Amendment.

The next task is to determine if the statute at issue implicates the First Amendment at all. *See Cornelius v. NAACP Legal Def. Fund & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985) (finding that, if the government's actions do not implicate speech protected by the First Amendment, the court "need go no further."). The statute at issue in this case is Wyo. Stat. § 22-25-106(h), which requires an organization which spends "over $500 in any primary, general, or special election to cause an independent expenditure or electioneering communication to be made must file. . . an itemized statement of contributions and expenditures at least seven days before the election." The statute defines electioneering communication as

> among other things, 1) any communication that is publicly distributed; 2) that refers to or depicts a clearly identified candidate for nomination or election to public office and that does not expressly advocate the nomination, election, or defeat of the candidate; 3) that can only be reasonably interpreted as an appeal to vote for or against the candidate; 4) that is made within 30 days of a primary election; and 5) that is targeted to electors in the geographic area the candidate would represent if elected.

Wyo. Stat. § 22-25-101(c)(i). Furthermore, an organization which fails to file the requisite report, after being notified of its failure and after twenty-one days of notice, is subject to civil penalties. *See id*. at § 22-25-108(b)(ii), (f).

In essence, the statute at issue imposes a disclosure requirement, mandating organizations which spend certain amounts on communications relating to elections to disclose their contributions. It is well-known that disclosure requirements implicate the First Amendment, particularly because of the fine line between the requirements burdening

the ability to speak and preventing speech. *See, e.g., John Doe No. 1 v. Reed*, 561 U.S. 186, 195 (2010) (citing *Citizens United*, 558 U.S. at 366). Accordingly, the statutes at issue which impose a disclosure requirement for some electioneering communications implicate the First Amendment.

The parties agree the standard under which disclosure requirements are viewed is that of exacting scrutiny, which "requires a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Citizens United*, 558 U.S. at 366–67 (internal citations and quotations omitted). To withstand exacting scrutiny, "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *John Doe No. 1*, 561 U.S. at 196, *see also Davis v. Federal Election Comm'n*, 554 U.S. 724, 744 (2008). The Supreme Court has recently held this level of scrutiny is appropriate given the "deterrent effect on the exercise of First Amendment rights that arises as an inevitable result of the government's conduct in requiring disclosure." *Americans for Prosperity Foundation v. Bonta*, No. 19-251, 141 S.Ct. 2373, 2383 (July 1, 2021). In *Americans for Prosperity Foundation*, the Supreme Court also clarified that exacting scrutiny does not require disclosure regimes to be the least restrictive means of achieving their ends, but it does require that "they be narrowly tailored to the government's asserted interest." *See* 141 S.Ct. at 2383.

In this instance, the Defendants highlight two government interests which support the reporting requirements established in Wyo. Stat. § 22-25-106(h). (*See* ECF No. 33 at 13.) Specifically, Defendants argue the anti-corruption interest and the informational interest are sufficiently important to candidate elections. (*Id.*) The Supreme Court has

recognized both governmental interests associated with reporting and disclosing campaign finances. *See Sampson v. Buescher*, 625 F.3d 1247, 1256 (10th Cir. 2010) (citing *Valeo*, 424 U.S. at 67). First, "publicizing large contributions and expenditures can 'deter actual corruption and avoid the appearance of corruption' and can facilitate detection of post-election favoritism." *Id*. (citing *Valeo*, 424 U.S. at 67). Next, disclosure of contributions and expenditures

> allows voters to place each candidate in the political spectrum more precisely than is often possible solely on the basis of party labels and campaign speeches. The sources of the candidate's financial support also alert to the interests to which a candidate is most likely to be responsive and thus facilitates predictions of future performance in office.

*Id*. (internal citations omitted).

WyGO does not contest the two interests the Defendants assert apply to this case, but argues Wyoming's electioneering communications statutes are not narrowly tailored to the interests. (*See* ECF No. 18.) "The Supreme Court has clearly recognized the informational interest in disclosures of contributions designed to influence elections." *Rio Grande Foundation*, 437 F.Supp.3d at 1607; *see also Majors v. Abell*, 361 F.3d 349, 352 (7th Cir.) ("[T]he quality of the political advertising that continues to be produced and disseminated under such a regime is enhanced because the advertising contains additional information useful to the consumer . . . In areas of inquiry where logic or exact observation is unavailing, a speaker's credibility often depends crucially on who he is.").

However, in *Citizens United v. Gessler*, the Tenth Circuit determined disclosures related to electioneering communications and independent expenditures are not helpful in deterring or exposing campaign corruption. *See* 773 F.3d 200, 210-11 (10th Cir. 2014) ("In

light of the Supreme Court's analysis in *Citizens United*, however, we do not agree that [disclosures relating to electioneering communications and independent expenditures] play a role in deterring or exposing campaign corruption."). In explaining its position, the Tenth Circuit recognizes the anti-corruption interest was more applicable to disclosure requirements of direct contributions to candidates. *Id.* at 211. However, independent expenditures and electioneering communications which are not coordinated with certain candidates are not tied to corruption. *Id.* WyGO is an independent non-profit association which was penalized for its failure to disclose its own contributions after purchasing a radio advertisement which was not coordinating with a campaign or candidate. The Defendants have failed to explain how disclosures of independent expenditures or electioneering communications would help deter or disclose corruption of concern. *See id.* at 211. Accordingly, the Court finds, at this preliminary stage, the informational interest supports disclosure requirements in the statutes at issue, but the anti-corruption interest does not.

### a. *Wyoming's Electioneering Communications and Disclosure Regime Likely Does Not Withstand Exacting Scrutiny*

Turning then to whether Wyoming's electioneering communications regime withstands exacting scrutiny, the Court finds it does not. Exacting scrutiny requires a "substantial relation between the disclosure requirement and a sufficiently important governmental interest"—in this case, the informational interest. *See Citizens United*, 58 U.S. at 366-67. The Court finds Wyoming's disclosure regime concerning electioneering communications similar to Colorado's, which the U.S. District Court for the District of Colorado recently determined failed exacting scrutiny. *Lakewood Citizens Watchdog*

*Group v. City of Lakewood*, No. 21-cv-01488-PAB, 2021 WL 4060630, at *13 (D. Colo. Sept. 7, 2021).

The electioneering communications issue in this case is similar to that in *Citizens United* where the Supreme Court upheld disclaimer requirements for advertisements promoting a movie about then-presidential candidate Hillary Clinton. *See* 558 U.S. at 368–69. Despite the advertisements not expressly advocating for or against her candidacy, the Court reasoned that the disclaimers nonetheless "provide the electorate with information and insure that the voters are fully informed about the person or group who is speaking." *Id.* at 368. The Court also explained that "disclosure is a less restrictive alternative to more compressive regulations of speech." *Id.* at 369. It ultimately upheld the disclosure requirements imposed on organizations making certain expenditures to electioneering communications, finding no constitutional impediment to the requirements. *Id.* at 369–70.

At the outset, there is no dispute that the statute does not prohibit organizations, such as WyGO, from engaging in political speech. *See Citizens United*, 558 U.S. at 366 (holding disclosure and disclaimer requirements "do not prevent anyone from speaking."). Requiring entities to "file an itemized statement of contributions and expenditures" directly furthers the State's interest in ensuring the electorate is provided with the necessary information so voters are fully informed and the electorate can make informed decisions and "give proper weight to different speakers and messages." *Free Speech v. FEC*, 720 F.3d 798 (quoting *Citizens United*, 558 U.S. at 371). However, First Amendment protections are triggered "not only by actual restrictions . . . . [t]he risk of a chilling effect on association is enough[.]" *Americans for Prosperity*, 141 S.Ct. at 2389. "It is hardly a

novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as forms of governmental action." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958).

Courts generally look at the administrative burden the disclosure requirement imposes or the amount that triggers the disclosure requirement to determine whether the disclosure requirement is substantially related to the government's interest. *See, e.g., Sampson*, 625 F.3d at 1259-60 (finding burdens on registration and reporting requirements to be too substantial to be justified by a public interest in disclosure); *Yamada*, 786 F.3d at 1195-96. In this case, the reporting and disclosure requirements in Wyo. Stat. § 22-25-106(h) are not significantly burdensome to organizations like WyGO. The section only applies to organizations spending more than $500 on an electioneering communication or independent expenditure in any primary, general, or special election. *See* § 22-25-106(h). Furthermore, the definition of electioneering communication limits the disclosure requirement even more, as it requires the communication to be made within thirty days of a primary election, sixty days of a general election, or twenty-one days of a special election. *See* § 22-25-101(c)(i)(C). Thus, organizations must only disclose expenditures made in that time period. In sum, the statutes require the entity to identify the organization or individual causing the communication to be made; file within the required timeframe; list contributions that relate to an electioneering communication; and provide a record of contributions related to the electioneering communication. *See* § 22-25-106(h).

While the disclosure requirements, may not be a burden on groups like WyGO, they do burden association rights of donors. In a recent Supreme Court decision, *Americans for*

*Prosperity*, the Court considered a disclosure requirement for charities in California, and found that the effect could chill association. *Americans for Prosperity*, 141 S.Ct. at 2389. The statute at issue required that charitable organizations to file an Internal Revenue Service Form 990, with the attached Schedule B, to renew their registrations as charities in the state of California. *Id.* at 2379–80. The Schedule B includes disclosures of donors names and address, so to better protect their donors, Americans for Prosperity did not file the attached Schedule B with the California Attorney General. *Id.* at 2380. In response, the Attorney General sent out a deficiency letter to Americans for Prosperity and threatened to revoke the organization's registration and impose civil fines. *Id.* Americans for Prosperity filed suit, arguing that this would chill association and that many donors preferred to remain anonymous. To support this preference, they submitted evidence that their donors have been subjected to "bomb threats, protests, stalking, and physical violence." *Id.* at 2388. Hundreds of similar charities and non-profits wrote *amici curiae* briefs in support of donor anonymity. *Id.*

The Court held that this was an unconstitutional "widespread burden on donors' associational rights . . . [which] cannot be justified on the grounds that the regime is narrowly tailored." *Id.* at 2389. The disclosure requirement had a tendency to chill association, and this potential chilling effect was unnecessary. *Id.* at 2388. The Supreme Court placed a heavy value on donors' rights to freely contribute to charities of their choosing without the public's knowledge.

The facts here present a similar argument. WyGO is a non-profit, whose aim is to defend and advance Second Amendment rights of Wyoming residents. Americans for

Prosperity, a public charity, is founded on a mission to educate and train about the principles of civil liberties and constitutionally limited government. *Id.* at 2380. Both organizations are non-profits dedicated to advocacy on potentially controversial political topics. Under Wyoming Statute §22-25-106(h)(v), WyGO is required to provide "the name of the person from whom received or to whom paid" any donation relating to an electioneering communication. (ECF No. 1 at 6.) WyGO raises a similar concern about donor privacy, correctly pointing out that citizens have an interest in keeping their political associations and beliefs private. (ECF No. 1 at 12; ECF No. 30 at 6.) The Supreme Court noted this same principle, highlighting "the vital relationship between freedom to associate and privacy in one's associations[.]" *Americans for Prosperity*, 141 S.Ct. at 2382 (quoting *NAACP*, 357 U.S. at 462).

Another recent decision within the Tenth Circuit further emphasizes the importance of donor privacy over disclosure requirements. In *Lakewood Citizens*, Lakewood Citizens Watchdog Group ("Watchdog") published two or three issues of a newsletter every year. *Lakewood Citizens*, No. 21-cv-01488-PAB, 2021 WL at *1. This newsletter highlighted local issues of importance to Lakewood, Colorado residents. *Id.* Some of these issues discussed mayoral and city council elections, although the newsletter also reported on non-political issues. *Id.* Watchdog refrained from publishing its Spring 2021 issue, for fear that the article previewing the 2021 city council race would be considered an independent expenditure or an electioneering communication under Lakewood, Colo., Municipal Code § 2.54.020. *Id.* at *2. This determination would subject Watchdog to certain disclosure requirements, namely reporting the name and address of the individual making the

expenditure be reported to the Lakewood City Clerk under Lakewood, Colo., Municipal Codes § 2.54.030 and §2.54.070. *Id.* at \*5.

The Court found it important that, while there was an informational interest served by "knowing 'who is speaking about a candidate shortly before an election[,]'" it was not certain that a donor to Watchdog was also a person speaking about a candidate. *Id.* at \*12 (quoting *Citizens United*, 558 U.S. at 369). As part of this analysis, the Court discussed *Independence Institute*, which upheld a disclosure requirement because only donations specifically earmarked for electioneering needed to be reported. *Id.* (quoting *Independence Institute*, 812 F.3d 787, 797–98 (10th Cir. 2016)). This was less intrusive than the Lakewood code, which required Watchdog to disclose the name and address of anyone who had donated more than $250 during the year to fund the organization's newsletters. *Id.* Essentially, a person who donated to Watchdog in January of a year where there would be a November election would still need to be disclosed, even though their donation might have already been spent before the sixty day period that electioneering communication expenditures must be reported. *Id.* This donor may have no strong feelings about a political candidate, but rather "simply value [Watchdog's] discussion of local issues[.]" *Id.* In contrast, a second donor may donate because they appreciate Watchdog's discussion of local politics and wish to support such coverage. *Id.* Both candidates must be disclosed under the Lakewood Code, as long as they gave over $250 annually. *Id.* The Court held the Lakewood Code did not meet exacting scrutiny because it would be less intrusive to include an earmarking provision for specific donations intended to further Watchdog's election coverage. *Id.*

WyGO's complaint presents similar facts. WyGO "uses a variety of media and formats to promote its message" including articles and videos posted to their website and to Facebook, among other methods. (ECF No. 1 at 4.) While WyGO only focuses on Second Amendment issues, they do not solely focus on election candidates, although that is the topic of the radio ad in this case. (*Id.*) WyGO's website articles focus on a range of Second Amendment topics, referring website visitors to other sites with more information, and reporting on recent federal, state, and local news that affects Second Amendment rights. Wyoming Gun Owners, https://www.wyominggunowners.org/ (last visited Sept. 15, 2021). A donor to WyGO could donate because they are interested in the political candidate surveys, the election coverage, or merely the general news coverage WyGO provides throughout the year. Under Wyoming's current statute, a donor's name would need to be disclosed regardless of which reason the donation was made. *See* § 22-25-106(h). A donor may have no interest in speaking about a candidate at all, but their name and association with WyGO would still be disclosed. As the Court held in *Lakewood Citizens Watchdog Group,* there is likely a less intrusive way to ensure that citizens know who is speaking about a candidate before an election rather than requiring this broad disclosure.

Defendants argue that Lakewood is distinguishable because "Wyoming's disclosure statute is significantly less intrusive than the regulations in *Lakewood*[,]" pointing to the low monetary threshold of Lakewood's Municipal code, coupled with the lack of an earmarking requirement. (ECF No. 37 at 2.) Defendants also argue that § 22-25-106(h) does include an earmarking requirement, because of the phrase "relate to." (*Id.*) However, this court is not convinced the use of the phrase "relate to" is enough to constitute an

earmarking requirement. No other state's electioneering statute uses such a broad phrase. (*See* ECF No. 38 at 28–29.) Furthermore, the statute leaves disclosure decisions up to the discretion of the entity, such as WyGO, rather than giving donors the choice to specifically allocate their donations for electioneering. This issue will require further development as the case proceeds on the merits but is not dispositive at this stage.

The Ninth Circuit also analyzed disclosure laws as they relate to Second Amendment advocacy in *National Association for Gun Rights, Inc. v. Mangan. See* 933 F.3d 1102, 1114 (9th Cir. 2019). In explaining the purpose for applying exacting scrutiny to Montana's statutory structure, which imposed disclosure requirements for political speech in the days leading up to an election, the court explained, "[r]equiring disclosure of information related to subtle and indirect communications likely to influence voters' votes is critical to the State's interest in promoting transparency and discouraging circumvention of its electioneering laws." *Id.*

In *Magnan*, the court upheld Montana's electioneering disclosure regime to the extent that it imposed disclosure requirements on organizations which made expenditures of more than $250 to disseminate a single electioneering communication. *Id.* at 1118-19. In upholding the statute's constitutionality, the court explained features in the statute which have survived exacting scrutiny under the First Amendment. *Id.* at 1122. However, the electioneering disclosure regime in *Magnan* is distinguishable from the statute at issue here and would likely warrant a different result.

Plaintiff in *Mangan*, the National Association for Gun Rights, Inc. ("NAGR") operated a similar non-profit to WyGO in Montana. *Id.* at 1107. NAGR keeps the public

informed on "where legislators and government officials stand on issues related to the Second Amendment." *Id.* at 1108. NAGR wanted to mail educational pamphlets to Montana residents "describing which public officials . . . supported the rights of citizens to keep and bear arms and engage in lawful self-defense, as well as those who have not done so." *Id.* However, because this would cost more than $250 to send to residents, NAGR did not distribute it, fearing it would be considered an electioneering communication under Montana law. *Id.* Montana law required that any "organization making an expenditure of more than $250 on a single electioneering communication" needed to register as a "political committee." *Id.* at 1109. Once registered as a political committee, NAGR would be required to disclose "to whom it is making expenditures, *but it is not required to report from whom it is receiving contributions unless those contributions were solicited or earmarked for a particular candidate*[.]" *Id.* at 1110 (emphasis added). The Ninth Circuit found that the NAGR was attempting to sway public opinion before an election, and that their primary purpose was political advocacy. *Id.* at 1116. Additionally, NAGR would only be required to register as an "incidental political committee" under this regime, which requires less invasive reporting. *Id.* at 1117–18. Ultimately, the Ninth Circuit upheld the constitutionality of this statute with regards to its disclosure requirement. *Id.* at 1122.

The statutory scheme in Wyoming is fundamentally distinguishable from the Montana scheme in *Mangan* in two ways. First, Wyoming's laws do not require WyGO to register as a political committee based on their expenditures. *See* §§ 22-25-101; 22-25-106. Montana's law provided for different reporting requirements depending on whether the organization was an incidental or an independent political committee, and this designation

triggered different disclosure requirements. *Mangan*, 933 F.3d at 1117. Additionally, the disclosure requirements that would have been triggered in *Mangan* if NAGR had to register as an incidental political committee are less burdensome than Wyoming's laws. Montana's statute required only disclosure of donations specifically earmarked for electioneering. *Id.* at 1110. Wyoming's law has no earmarking requirement, making its laws more intrusive on donor privacy than those statutes at issue in *Mangan*. Also notable is the fact that *Mangan* was decided in 2019, almost two years prior to the decision in *Americans for Prosperity* which emphasized donor privacy.

While earmarking is not a requirement to withstand exacting scrutiny, it has been a heavily weighted factor in federal courts, particularly within the Tenth Circuit and the Supreme Court. *Lakewood Citizens* 2021 WL 4060630 at *12; *Independence Institute*, 812 F.3d at 797 (noting the statute included an earmarking requirement, limiting the disclosure requirements to only certain donations); *Citizens United*, 558 U.S. at 797–98 ("[I]t is important to remember that the Institute need only disclose those donors who have specifically earmarked their contributions for electioneering purposes"). Based on recent controlling case law, it is unlikely that Wyoming Statute § 22-25-106(h) would survive exacting scrutiny. Thus, the first element required for a preliminary injunction, success on the merits, is satisfied.

### 2. Irreparable Injury

Moving to the second element required to grant a motion for a preliminary injunction, Plaintiff must show a high likelihood of harm that cannot be remedied with money damages. *State v. United States Environmental Protection Agency*, 989 F.3d 874,

884 (10th Cir. 2021). The harm must be "certain and great" and "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (internal citations omitted). If the harm will not occur before this Court rules on the merits, a preliminary injunction is not necessary. *Id.*

WyGO argues that irreparable harm should only be measured on the likelihood of success on the merits because they assert a first amendment claim. (ECF No. 30 at 23.) They further urge that timing is crucial because this case presents an issue of political speech and even a day or two of delay "may be intolerable." (*Id.* (quoting *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009)). However, WyGO fails to present any evidence showing why a preliminary injunction is necessary to prevent irreparable harm from the alleged First Amendment violation. Instead, they merely quote prior case law but do not apply it to the facts of this case. *See* E.F.C. No. 30 at 23.

Defendants counter that for a preliminary injunction, the harm must be "certain, great, and actual[.]" (ECF No. 33 at 20. (quoting *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003))). Defendants further point out that because they are unlikely to succeed on the merits of their First Amendment claim, a preliminary injunction is not warranted. (*Id.*)

While neither party presents a compelling argument on the issue of irreparable harm, this Court agrees with the Defendants that there is no risk of immediate injury. Defendants imposed only a $500 fine on WyGO. (ECF No. 1 at 11.) Mr. Dorr, WyGO's treasurer and principal, stated in his declaration "unless [WyGO] obtains greater clarity about Wyoming's campaign finance laws, we intend to forego speaking during election

season[.]" (ECF No. 30-1 at 9.) This statement does not indicate immediate injury to WyGO because 2021 is not an election year and there are no special elections currently scheduled and the next primary election is not scheduled until August 16, 2022. *See 2020 Election Calendar*, Wyoming Secretary of State (last visited Sept. 17, 2021) *https://sos.wyo.gov/Elections/Docs/2022/Calendar.aspx*. Thus, even if WyGO does forego speaking during election seasons, they are not restricted from speaking any other time. Wyoming Statute § 22-25-106 only regulates speech within thirty days of a primary election, sixty days of a general election, or twenty-one days of any special election. None of these time periods are approaching within the next year, so the danger of any harm to WyGO's advocacy is remote and a merits decision will be issued prior to these time periods becoming applicable. *See Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1260 (10th Cir. 2003) (in determining whether party satisfies the irreparable harm requirement court must decide whether harm likely to occur before the court rules on the merits). The closest WyGO faces to irreparable harm at this time is paying the $500 fine. To remove that potential harm the Court will suspend collection of that payment until this Court rules on the merits of Plaintiff's claims. However, beyond the fine, this Court finds no imminent danger of irreparable harm before this court rules on the merits of Plaintiff's claims.

### Conclusion

In accordance with the foregoing discussion, the Court finds WyGO has not satisfied the four elements required for the Court to grant a preliminary injunction against Defendants. While there is evidence that WyGO would succeed on the merits, there is no evidence of irreparable harm, because WyGO's political speech is not being actively

censored or restricted. Without proving this second element, WyGO does not meet the test necessary to obtain a preliminary injunction.

ORDERED that Plaintiff WyGO's *Motion for Preliminary Injunction* is DENIED. It is

FURTHER ORDERED that during the pendency of this action and until final judgement herein, WyGO's obligation to pay the $500 fine imposed against it by Defendants is hereby suspended pending this Court's ruling on the merits. It is

FURTHER ORDERED that WyGO's request for oral argument on this issue is DENIED.

Dated this _17th_ day of September, 2021.

Scott W. Skavdahl
United States District Judge